PLUMMER v BECHTEL CONSTRUCTION COMPANY

Docket No. 89153. Argued October 8, 1991 (Calendar No. 18). Decided September 15, 1992. Motion for rehearing and bill of costs dismissed upon stipulation of the parties with prejudice and without costs December 7, 1992.

Thomas C. Plummer, Jr., a pipe fitter employed by Babcock & Wilcox, a subcontractor, brought an action in the Wayne Circuit Court against Bechtel Construction Company, the general contractor for the construction of the Detroit Edison Company's Belle River Power Plant, and against the Detroit Edison Company, seeking damages for injuries sustained on the job. The court, Sharon Tevis Finch, J., entered judgment on a jury verdict for the plaintiff, apportioned with respect to the plaintiff's fault. The Court of Appeals, SAWYER, P.J., and WEAVER and NEFF, JJ., reversed, finding that neither Edison nor Bechtel owed a duty to the plaintiff (Docket No. 103017). The plaintiff appeals.

In an opinion by Justice LEVIN, joined by Chief Justice CAVANAGH and Justice BRICKLEY, with Justice BOYLE, joined by Justice MALLETT, concurring in the result, the Supreme Court: Reversed the judgment of the Court of Appeals.

Justice LEVIN, joined by Chief Justice CAVANAGH and Justice BRICKLEY, stated that ample evidence was presented that Edison retained control of the work and, together with Bechtel, owed the plaintiff the duty of taking reasonable steps to guard against dangers that were readily observable and avoidable. The Court of Appeals erred in substituting its assessment of the record for that of the jury.

In concluding that Edison and Bechtel did not owe a duty to the plaintiff, the Court of Appeals confused the questions of duty and standard of care. The question of duty does not depend on, nor is it affected by, the plaintiff's behavior or fault. The plaintiff's fault is relevant to the question of causation, not to who retained control of the work. The trial court properly posed to the jury the questions: whether the accident occurred at a common work area; who had supervising and coördinating authority to guard against dangers in common work areas; the observability, foreseeability, and avoidability of dangers; and whether the workers had been warned of the dangers. The

Court of Appeals confused the foreseeability of a worker falling off an unguarded platform with the foreseeability of a worker coming to work in a drunken state. In addition to substituting its judgment with respect to causation, the Court of Appeals substituted its judgment with respect to the element of breach, questions for the jury.

There was ample evidence that Edison had retained control of the construction project, and the jury properly could hold Edison liable for a failure to observe reasonable safety precautions and provide reasonable safeguards. In addition, there was sufficient evidence to justify the jury's decisions that the platform was a common work area, that the unguarded platform was readily observable, and that the risk of falling, attendant to the absence of guardrails, was avoidable. The correct inquiry is not whether the accident was anticipated, but whether such an accident should have been.

Justice BOYLE, joined by Justice MALLETT, concurring, stated that an owner who acts in a superintending capacity and has knowledge of high degrees of risk faced by construction workers is not absolved from responsibility for failing to require observance of reasonable safety precautions and may be held liable for its negligence. The scope of the duty is limited by the extent of control retained. Contractual provisions between the owner, general contractor, and various subcontractors and the actual control exercised are relevant considerations in determining whether an owner or general contractor retained control. The question whether Detroit Edison was negligent is dependent on the degree of control it in fact retained, and the scope of its duty is limited by the extent to which it retained control. Thus, if it retained control solely to inspect the job site to determine that it received the benefit of the work for which it contracted, its duty similarly would be limited. In this case, conflicting inferences regarding the extent of retained control were possible. The evidence regarding Edison's role at the site was sufficient for a jury to conclude that it retained control of the safety aspects of the job and that its negligence regarding those aspects was a proximate cause of the plaintiff's injuries. Whether Detroit Edison properly performed its duties in that regard and whether any failure proximately caused the plaintiff's injuries were also questions for the jury.

Reversed.

Justice RILEY, dissenting, stated that there was insufficient evidence presented to establish that either defendant owed a duty to the plaintiff or that the alleged duty was breached. The policy underlying *Funk v General Motors Corp*, 392 Mich 91

(1974), that was used to advance theories of employment relationships that could render property owners and general contractors absolute insurers of any injury of an employee of an independent contractor should be rejected as a significant departure from time-tested theories of tort liability and in light of the adoption of comparative negligence.

Justice GRIFFIN, dissenting, stated that the majority's unwarranted expansion of *Funk,* will not serve the public interest.

The concept of duty in a negligence action is used in determining whether a particular plaintiff is entitled to protection. Generally a landowner is not responsible for injuries caused by a carefully selected contractor to whom the responsibility for construction has been delegated. Nevertheless, general contractors and owners must assure that reasonable steps within their supervisory and coördinating authority are taken to guard against readily observable, avoidable dangers in common work areas that create a high degree of risk to a significant number of workers. Imposing liability where, as in this case, the owner and the general contractor took such reasonable measures goes too far. The owner created and coördinated a safety program, and the general contractor implemented and monitored it. Imposition of liability on either defeats the goals underlying *Funk.*

182 Mich App 308; 451 NW2d 631 (1990) reversed.

*Crenshaw & McMahon, P.C.* (by *Leonard D. McMahon*); *Bendure & Thomas,* of counsel (by *Mark R. Bendure*), for the plaintiff.

*Kitch, Saurbier, Drutchas, Wagner & Kenney, P.C.* (by *Gregory G. Drutchas* and *Susan Healy Zitterman*), for the defendants.

Amicus Curiae:

*Philo, Atkinson, Steinberg, White, Stephens & Whitaker* (by *Richard L. Steinberg*) for Michigan Trial Lawyers Associaton.

LEVIN, J. Thomas C. Plummer, Jr., a pipe fitter employed by Babcock & Wilcox, a subcontractor, commenced this action against Bechtel Construc-

tion Company, which acted as general contractor for the construction of The Detroit Edison Company's Belle River Power Plant, and Edison to recover damages for injuries Plummer sustained on the job.

A jury awarded damages of $1,100,000, against Bechtel and Edison, which was reduced to $825,000 because the jury apportioned twenty-five percent fault to Plummer.[1] The Court of Appeals reversed, stating that Edison did not retain control of the work, that Bechtel took "reasonable steps within its supervisory and coördinating authority to guard against 'readily observable, avoidable dangers' " within the meaning of this Court's decision in *Funk v General Motors Corp,* 392 Mich 91, 104; 220 NW2d 641 (1974), and that "it was unobservable or unforeseeable that plaintiff would get drunk and then leave the guardrailed catwalk to work on an unprotected scaffold without requesting safety assistance or tying off as he had been instructed."[2] The Court of Appeals concluded that neither Edison nor Bechtel "owed a duty to plaintiff."[3]

We conclude that there was ample evidence that Edison retained control of the work and, together with Bechtel, owed Plummer the duty of taking reasonable steps to guard against dangers that were readily observable and avoidable.

The Court of Appeals, in concluding that Edison and Bechtel did not owe a *duty* to Plummer,

---

[1] The circuit judge denied Edison's and Bechtel's motions for judgment notwithstanding the verdict or for remittitur.

In *Hardy v Monsanto Enviro-Chem Systems,* 414 Mich 29; 323 NW2d 270 (1982), this Court allowed the defense of comparative fault where there was a failure to provide an adequate safety device in the workplace and evidence of a worker's fault.

[2] *Plummer v Bechtel Construction Co,* 182 Mich App 308, 311, 312; 451 NW2d 631 (1990).

[3] *Id.,* p 312.

confused the questions of *duty* and *standard of care.* "It obscures the separate issues in a negligence case (duty, proximate cause and general and specific standard of care) to combine and state them together in terms of whether there is a duty to refrain from particular conduct," *Moning v Alfono,* 400 Mich 425, 432-433; 254 NW2d 759 (1977), or, in the instant case, whether Edison and Bechtel were obliged to take particular steps to guard against readily observable, avoidable dangers in common work areas.

It is a factual issue, for resolution by the jury as trier of fact, whether it was readily observable that the guardrails had been removed from the unprotected scaffold or platform from which Plummer fell, and, similarly, whether there was, as Edison and Bechtel contended and Plummer disputed, a place where Plummer could have "tied off " by attaching a line from his safety belt. It is a question of the standard of care, and not duty, whether, if the jury found there was not a place where Plummer could have tied off, Edison and Bechtel should have foreseen the danger of a worker leaving the guardrailed catwalk for the unprotected platform and should therefore have caused a wire or other means of tying off to be installed when the guardrails were removed; that, too, on this record, presented an issue for submission to the jury.

It was also for the jury to decide (i) whether Plummer had been instructed not to leave the guardrailed catwalk to work on an unprotected platform without requesting safety assistance for tying off, and, (ii) if so, whether he was one hundred percent at fault or, as the jury found, twenty-five percent at fault, in leaving the guardrailed catwalk to attempt, from the unprotected platform, to free the pipe although he had not been

able to tie off and had not requested safety assistance for tying off. It was further for the jury to decide (iii) the degree of fault attributable to Plummer's inebriation, and (iv) whether Edison's and Bechtel's failure to take steps the jury found should have been taken to guard against the danger of a worker falling from the unguarded platform was a cause, or whether Plummer's inebriation was a cause or the sole cause, of the fall.

I

Plummer fell from a work platform at the Belle River construction site, suffering multiple skull fractures.[4] At the time of the accident, he was a journeyman pipe fitter and certified welder.

The Belle River construction project involved approximately 2500 workers and a number of subcontractors. Plummer was employed on the construction project by one of the subcontractors, Babcock & Wilcox.

Bechtel acted as the general contractor and one of the working contractors. It had general responsibility for managing the subcontractors.

Edison owned the project. It retained the authority to hire or terminate subcontractors, or to order Bechtel to hire or terminate any subcontractor. Indeed, Edison, rather than Bechtel, hired Babcock & Wilcox.

An Edison "site safety and insurance coördinator," Gary Western, was at the construction site daily. It was Western's responsibility to "[o]bserve and report the basic safety operation through out the project" and to assure that the safety provi-

---

[4] As a result of this fall, Plummer has a steel plate in his head and is blind in one eye. When he was able to return to work, after a year recovering from the accident, he could no longer meet the requirements for a certified welder.

sions of the project contract were performed. Western frequently walked through the project, inspecting for safety compliance. He spoke about safety with employees of subcontractors, including Babcock & Wilcox employees. Western was empowered to require that safeguards be implemented and that unsafe practices be stopped.

Bechtel employed four persons who were at the construction site almost daily to observe and monitor subcontractor safety performance and compliance. They also had the power to require subcontractors to correct an unsafe condition.

The Belle River project was over two hundred feet in height.[5] Workers employed by a number of subcontractors were at the site at any given time. To facilitate access to the various parts of the project, a system of catwalks had been installed at different levels. Each level of the catwalk system was connected so that workers could reach the various elevations of the construction project while still remaining inside the catwalk system.

The record is unclear concerning who installed the catwalk system. It is clear, however, that workers employed by different subcontractors regularly used the system to walk to and perform their work at various levels.

The catwalks were constructed of caged wire. The ceiling and floor were completely enclosed with caged wire. One or both sides of the catwalk were enclosed with caged wire or guardrails. At the site of the accident, there was caged wire on one side, and, so that workers could reach and have access to the work to be done, handrails on the other side.

In an apparent effort to provide additional access to the work under construction, platforms

---

[5] The two boilers were two hundred fifty feet in height.

perpendicular to the catwalk had been constructed at the level where Plummer was working at the time of the accident. When originally installed, there were guardrails on both sides of the platforms.

For at least two weeks before the accident, however, the guardrails had been removed from the platform from which Plummer fell. It does not appear who removed the guardrails. There was testimony that the guardrails had been removed because they would have made it impossible to move into place awkwardly shaped pipes that were then being installed.

The guardrails that had been removed from the platform from which Plummer fell were piled in a large stack on the ground for the two-week period before the accident. The Edison safety supervisor, Gary Western, acknowledged that he had observed the unguarded platforms before the accident. While Western could not recall observing workers on the unguarded platforms before the accident, he acknowledged that he was aware of the platforms. Bechtel's project safety supervisor, Gary Suenkel, acknowledged that he had been in the area of the accident before Plummer fell.

Before reporting to work on the day of the accident, Plummer shared a pint bottle of liquor with a co-worker on the way to work. Plummer testified that he had nothing to drink after he arrived at the job site, and neither Edison nor Bechtel assert otherwise. Plummer arrived at 8:00 A.M. and the accident occurred at 10:00 A.M.

Upon arrival, Plummer was assigned by Babcock & Wilcox to a three-man pipe fitting crew.[6] The pipe fitting crew was sent through the catwalk

[6] This was the first time Plummer had worked with a pipe fitting crew. His earlier assignments at this construction site were with furnace crews.

system to an elevation forty feet above ground level to connect a 25-foot-long, 90-degree-bent pipe. The pipe weighed more than two tons and was hard to maneuver. A crane had moved the pipe up the side of the catwalk structure where Plummer's crew was working.

As the crew attempted to move the pipe into position, a chain that was holding the pipe onto the crane became caught on a platform, and the pipe became stuck. Although no one specifically ordered Plummer and the two co-workers to leave the guarded catwalk system, Plummer and one of the two co-workers left the protection of the guarded catwalk system and walked onto the unguarded platform to free the pipe.[7]

Plummer testified that although caged wire precluded access to the other platforms, in this case, he and his co-worker were able to move from the catwalk to the platform because there was no caged wiring—only a guardrail—where the platform met the catwalk.

While Plummer stood on the south side of the platform and his co-worker stood on the north, they attempted to free the pipe and chain. The co-worker was using a two-by-four board,[8] and Plummer was pulling on the chain. The chain released suddenly, and Plummer was pitched backward off the platform. Plummer fell about twenty feet, struck a steel girder, and fell another ten feet or so onto the top of a temporary work shed that was used by employees of a number of subcontractors to store their equipment.

Plummer was wearing a safety belt and a standard three- or four-foot-long lanyard, but he had not tied himself by his safety rope because, he

[7] There was no evidence that the co-worker had consumed any liquor before reporting to or during work.

[8] It does not appear where this $2 \times 4$ was obtained.

said, he could not find a place to do so. Considerable evidence was adduced at trial on the disputed factual question whether there was a place that Plummer could have tied off. Plummer presented evidence that, given the awkward shape of the pipe and the position he was working in, it was not possible to tie off safely.[9] Detroit Edison and Bechtel presented evidence that there were places where Plummer could have tied off.[10]

## II

Edison and Bechtel offered expert testimony that on the basis of Plummer's blood sample, tested at the hospital where he was treated, he must have had a blood-alcohol level higher than 0.193 at the time of the accident. Edison and Bechtel presented further expert testimony that such a blood-alcohol level would have seriously impaired Plummer's work performance in the workplace and that such a high level probably resulted from more than the four ounces of alcohol that Plummer acknowledged consuming.

The Court of Appeals focused on Plummer's consumption of alcoholic beverages before reporting to work, and concluded that Bechtel and Detroit Edison did not owe a *duty* to Plummer because they could not have foreseen that Plummer "*would get drunk* and then leave the guardrailed

[9] Plummer and one of the co-workers testified that there was no place where Plummer could have safely tied off. An incident claim report prepared by an insurance adjuster stated that one of Babcock & Wilcox' safety supervisors had visited the platform from which Plummer had fallen, and, upon numerous attempts, was unable to tie off.

[10] Edison and Bechtel's safety supervisors opined that there were reasonably close places where Plummer could have tied off. Both acknowledged that they had not, nor did they know of anyone who had, visited the platform that Plummer was working on and successfully been able to tie off.

catwalk to work on an unprotected scaffold without requesting safety assistance or tying off as he had been instructed."[11]

The duty question does not depend on, nor is it affected by, Plummer's behavior or fault. Plummer's fault pertains to the question of causation and does not bear on the questions whether Detroit Edison retained control of the work, whether the accident occurred at a common work area, whether Bechtel had supervising and coördinating authority to guard against dangers in common work areas, whether the danger of the unguarded platform was readily observable, whether it could be foreseen that a worker might leave the safety of the guardrailed catwalk for the unguarded platform in order to do the work, whether Plummer and his co-workers had been warned not to leave the guardrailed-catwalk system for an unguarded platform without requesting safety assistance to tie off, and whether, if there was no place to tie off, the accident could have been avoided by providing a place to tie off.

While the judge's instructions to the jury properly posed this question,[12] the Court of Appeals confused the issue. The Court confused the foresee-

[11] See n 2.

[12] The instruction given was:

The Plaintiff has the burden of proving each of the following propositions: (A) That Plaintiff was working in a common work area. That is, an area where employees of more than one contractor are or may be expected to be employed. (B) That the common work area he was working in was dangerous and created a high degree of risk to a significant number of workers. (C) That this danger was readily foreseeable to Defendant Bechtel. (D) That Defendant Bechtel failed to exercise reasonable care so as to eliminate the risk. (E) That the Plaintiff sustained injuries. (F) That the Defendant Bechtel's failure to eliminate the risk was the proximate cause of the Plaintiff's injuries.

ability of a worker falling off the unguarded plat-
form with the foreseeability of a worker coming to
work in a drunken state. The Court concluded that
because Bechtel could not have foreseen the latter,
it also had no duty with respect to the former.
This analysis was incorrect.

The intoxication of Plummer pertains to causa-
tion. The trial judge correctly instructed the jury
on this point as well.[13] The Court of Appeals,
however, confused the issue of Plummer's intoxica-
tion with Bechtel's duty of safety in common work
areas.

In addition to substituting its judgment with
respect to causation, the Court of Appeals substi-
tuted its judgment with respect to the element of
breach. The Court concluded that because Bechtel
required its subcontractors to conduct weekly
safety meetings, it did not breach any duty it may
have owed Plummer. This was, however, a ques-
tion for the jury to resolve.

The Court of Appeals found as fact that Plum-
mer had been instructed to request safety assis-
tance and that he violated instructions when he
left the guardrailed catwalk to work on the unpro-
tected scaffold or platform. The evidence is far less
specific. The workers were provided with safety
belts, called lanyards, and were instructed to tie
off. There is no evidence that they were told that
they should request safety assistance for tying off

---

[13] The instruction was:

Negligence on the part of the Plaintiff does not bar recovery
by the Plaintiff against the Defendant. However, the percent-
age of negligence attributable to the Plaintiff will be used [by]
the Court to reduce the amount of damages which you find to
have been sustained by the [Plaintiff].

This instruction is consistent with this Court's holding in *Hardy v
Monsanto Enviro-Chem Systems,* n 1 *supra.*

when working in an area where they could not find a place to tie off.[14]

Noteworthy in this connection is that one of Plummer's co-workers also left the safety of the protected catwalk for the unprotected platform. There is no evidence that he tied off or that he had had anything to drink before coming to work or on the job. Nor did Plummer give any sign of being intoxicated or unable to work during the two hours between the time he reported for work and the time the accident occurred.

III

Turning to the duty question with respect to

_____

[14] Gary Suenkel, Bechtel's safety supervisor, testified at trial that if he saw a condition that appeared to be unsafe, he would report it to the person able to correct it, and that he would expect anybody to do the same and that he would "expect, Thomas Plummer to report an unsafe condition to his supervisor[.]"

Gary Western, Edison's safety coördinator, was asked on redirect examination, "Where does [Plummer] go for help?" Western answered, "To his supervisor." The record contains no evidence, however, supportive of the Court of Appeals conclusion that Plummer had been "instructed" to request "safety assistance." 182 Mich 308, 312; 451 NW2d 631 (1990).

With regard to how Plummer was in fact instructed concerning safety, Western testified that Plummer was obligated under MIOSHA rules to tie off. He further testified that individual subcontractors, including Babcock & Wilcox, held "tool box safety meetings" with their employees where subjects such as "[e]lectric cords, tools, safety belts and hard hats, general housekeeping" were discussed. Suenkel testified that Bechtel maintained a safety library on site that included OSHA and MIOSHA rules and regulations, and that these materials were available to supervisors employed by the individual subcontractors. He further testified that Babcock & Wilcox' tool-box meetings were conducted weekly and that the employees were required to sign in to show their attendance at the meetings.

The attendance and agenda sheets from Babcock & Wilcox' weekly tool-box safety meetings for September 21, 1982, October 13, 1982, October 20, 1982, and November 3, 1982, were admitted into evidence. While Plummer's signature appears on each of these sheets, nothing indicates that the subject of unguarded platforms or a situation where a worker could not tie off was discussed. Indeed, the lists of the items discussed at these meetings make no mention of tying off or seeking supervisory assistance.

Edison, this Court in *Funk* observed that "[o]rdinarily a landowner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated the task of erecting a structure," but that "[a]n owner is responsible if he does not truly delegate—if he retains 'control' of the work . . . ."[15]

## A

As in *Funk,* the owner here, Edison, "exercised an unusually high degree of control over the construction project from its very inception."[16] There were approximately one hundred twenty-five Edison employees at the site, including in excess of twenty inspectors for every type of discipline there might be.

Gary Western, Edison's site safety and insurance coördinator, had the responsibility of assuring that safety programs were implemented and that the provisions of the contract as they related to safety were being carried out. If Western became aware of a MIOSHA violation, he was empowered to warn a subcontractor directly or to ask Bechtel to require that appropriate safety precautions be taken. Edison had contracted directly with Babcock & Wilcox, but, even if it had not, it had the authority to require Bechtel to terminate any subcontractor. There was thus ample evidence that Edison had retained control of the project, and the jury could properly hold Edison subject to liability for a failure to observe reasonable safety precautions and provide reasonable safeguards.

## B

The mere presence of one hundred twenty-five

[15] *Id.,* p 101.
[16] *Id.,* p 105.

Edison employees at the site does not, indeed, necessarily mean that Edison retained control of the work. As set forth in comment (c) to § 414 of volume 2, the Second Restatement of Torts,[17] an owner or general contractor who "has merely a general right to order the work stopped or re-

---

[17] a. If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others.

b. The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so.

c. In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way. [*Id.*, pp 387-388.]

sumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed" would not be deemed to have retained control. Edison would not have retained a right of control by merely overseeing the project and monitoring general progress to ensure compliance with contract specifications.

Edison retained the authority to order Bechtel to hire or terminate any subcontractor. Indeed, Edison, not Bechtel, hired Babcock & Wilcox. An Edison site safety and insurance coördinator, Gary Western, was on the construction site daily. It was Western's responsibility to observe and report concerning the basic safety operation throughout the project and to assure that the safety provisions of the project contract were performed. Western frequently walked through the project, inspecting for safety compliance. He spoke about safety *directly with employees of subcontractors, including Babcock & Wilcox employees.*

The jury was not obliged to conclude that "suggestions"/"recommendations" from Western concerning safety, in the words of the Restatement commentary, "need not necessarily be followed."[18] The jury could properly conclude that because of Edison's retained power to hire or terminate subcontractors, Western's assessments or decisions concerning safety were "necessarily" to be followed by subcontractors. Because of the retained authority to hire or terminate, there was, again in the words of the Restatement commentary, "such a retention of a right of supervision that the contractor is *not entirely free* to do the work in his own way."[19]

The line drawn in the Restatement commentary seeks to differentiate between a situation where

---

[18] 2 Restatement Torts, 2d, § 414, comment (c), p 387.
[19] *Id.*

the subcontractor "need not" follow the suggestions or recommendations of the owner/general contractor, as the case may be, or persons monitoring the work for the owner/general contractor, and a situation where the right of supervision retained by the owner/general contractor is such that the subcontractor is not "entirely free" to ignore suggestions and recommendations.

The distinction is illustrated by *Duplantis v Shell Offshore, Inc,* 948 F2d 187, 193 (CA 5, 1991), where the United States Court of Appeals for the Fifth Circuit concluded that although the owner, Shell Offshore, Inc., took "an *active interest* in the safety of the employees of its independent contractor," that did "not, in and of itself, constitute direct operational control." The Shell representative held safety meetings with the general contractor and subcontractor. He did not, however, have the authority to remove or otherwise give orders to general contractor/subcontractor personnel. "Rather, he had to go through [the chief general contractor/subcontractor employee on the rig] in the form of suggestions or advice."[20]

---

[20] *Id.*

Similarly, see *Lewis v Riebe Enterprises, Inc,* 170 Ariz 384, 390; 825 P2d 5 (1992), cited in the concurring opinion. In *Lewis,* the Supreme Court of Arizona addressed the contention that comment (c) means that "a general contractor is subject to liability under § 414 only if it retains control over the subcontractor's method of doing the *details* of the work." (Emphasis in original.)

The court said:

Comment (c) does *not* say that a general contractor must control the day-to-day details of a subcontractor's work in order to be subject to liability under § 414. Comment (c) merely suggests that "[i]f the employer reserves and exercises *only* the right to inspect the construction work to see that the contract specifications are met while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject it to liability." [*Id.,* 170 Ariz 391. Emphasis in original.]

The court continued:

Thus, if a general contractor assumes affirmative duties with

The record in the instant case tends to show, and the jury could find, that Edison, through Western, had the ultimate control of the level of safety on the job.[21]

C

It has been suggested[22] that the imposition of liability on Edison might discourage owners from creating a safe working environment. When the Belle River Power Plant was under construction, Edison's immediate concern was timely completion of the plant within the contemplated cost of con-

---

respect to safety, it retains sufficient control to be held liable under § 414 for its negligent exercise of its safety responsibilities. [*Id.*]

[21] Comment (b) to § 414 would subject to liability a person retaining control if he failed to prevent subcontractors from doing even details of the work in a way unreasonably dangerous to others, or if he knew, or by the exercise of reasonable care should have known, that the subcontractors' work was being so done and had the opportunity to prevent it by exercising the power of control he retained.

The Illinois Court of Appeals would go further. In *Pasko v Commonwealth Edison Co,* 14 Ill App 3d 481, 489; 302 NE2d 642 (1973), the court held that because the "[d]efendant could order the work halted if it felt that unsafe procedures were being followed, and could prevent the work from being resumed until, in its opinion, proper means and methods were employed to avoid injury or property damage," and because the "[d]efendant could order that any of [the independent contractor's] equipment be removed from the jobsite if, in its opinion, such equipment was unsafe or inadequate," "it was, at the very minimum, a question of fact for the jury as to whether the defendant had retained sufficient control over the safety aspects of the project as to be liable for a failure to properly exercise that control."

Similarly see *Smith v United States,* 497 F2d 500, 513 (CA 5, 1974), where the United States Court of Appeals for the Fifth Circuit held that although the prime contractor had not in fact exercised the "slightest control" concerning the methods used by the subcontractor's employees, it was nevertheless subject to liability because the contract had given it the requisite authority to control the safety procedures employed at the job site.

[22] See *Wilson v Portland General Electric Co,* 252 Or 385; 448 P2d 562 (1968).

struction. The immediate safety concern was not lawsuits, but compliance with OSHA and MIOSHA standards and satisfying insurance carriers that the requisite steps had been taken to reduce their exposure in what was clearly a dangerous construction project.

While Edison might be concerned about a decision of this Court concerning the extent of its liability to employees of subcontractors, such as Plummer, Edison apparently was of the view that it must retain a large measure of control in order to discharge its responsibility to its stockholders, securities underwriters, the regulatory authorities, customers, and the public generally.

D

In *Everette v Alyeska Pipeline Service Co,* 614 P2d 1341, 1347 (Alas, 1980), the Alaska Supreme Court, in reversing a summary disposition in favor of the owner, said:

> On the other hand, if the employer retains the right to direct the manner of the independent contractor's performance of its work or to superintend the work in any meaningful way, the employer has retained sufficient control to be held liable. . . . Whether the employer has retained such control is a question of fact which ordinarily should be left to the jury or, in a bench trial, to the judge. . . . In making this determination [whether summary disposition is appropriate], we are required to view the evidence in the light most favorable to the non-moving party, Everette [the plaintiff and injured worker], drawing all inferences in his favor.

It appears that Alaska recognizes that an employer of an independent contractor can be found

liable although the employer retains less than the kind of direct control that agency law would require, and that an employer who affirmatively assumes safety duties can also be found liable under a "retained control" theory, even if this was undertaken gratuitously.[23]

---

[23] In a subsequent decision, *Moloso v State,* 644 P2d 205, 211 (Alas, 1982), the Alaska Supreme Court said:

> [I]f the employer retains the right to direct the manner of the independent contractor's performance, or *assumes affirmative duties with respect to safety,* the employer has retained sufficient control to be held liable if he exercises that control negligently. Comment a to § 414 indicates that the degree of control retained may be less than that which would be necessary to subject the employer to liability as a master, and is therefore consistent with a generally independent contractor relationship . . . . [See also *Exxon Corp v Alvey,* 690 P2d 733, 737-736 (Alas, 1984); *Hammond v Bechtel,* 606 P2d 1269, 1274-1276 (Alas, 1980); *Hobbs v Mobil Oil Corp,* 445 P2d 933, 934 (Alas, 1968). Emphasis added.]

The *Moloso* court concluded that the issue of the owner's liability was for the jury because "reasonable minds could differ as to whether the state retained sufficient control over the construction operation to impose a duty of care owed to the Molosos . . . ." *Id.,* p 214. Key to this conclusion was the court's observation that the contract between the state (the owner) and the general contractor gave the *state* engineer the authority to suspend the work wholly or in part for unsafe conditions. *Id.,* p 213.

In *Parker Drilling Co v O'Neill,* 674 P2d 770, 775 (Alas, 1983), the Alaska Supreme Court noted that it has "also held that § 324A [2 Restatement Torts, 2d] prescribes an assumed duty to act, analytically similar to the duty recognized under § 414. . . . Section 324A provides that one may voluntarily assume the responsibility to act for the protection of others."

The court said that "there is a common law duty to provide a safe worksite running to whomever supplies and controls that worksite. This duty protects all workers on the site and not just the employees of the defendant. The duty is not dependent upon the existence of any particular combination of contractual relationships." *Id.,* p 776.

In concluding that a directed verdict in favor of the plaintiff imposing liability on the defendant was correctly issued, the Alaska Supreme Court relied on the following facts: "(1) Parker [the defendant] owned the drilling rig [where plaintiff's accident occurred]; (2) Parker provided the stabbing board; (3) Parker's employee ran the drilling operation and the traveling block; (4) Parker's driller was directly responsible for safety and supervision at Rig 141; (5) The driller's immediate superior, the toolpusher, also responsible for safety, was also a Parker employee." *Id.*

IV

In *Funk,* this Court held that a general contractor has the duty "to assure that reasonable steps within its supervisory and coördinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen."[24]

A

Edison and Bechtel contend that the unguarded platform was not a common work area. We conclude that there was sufficient evidence to justify the jury's decision that it was.[25]

Edison and Bechtel contend that the platform did not become a common work area because there was no evidence that an employee of a subcontractor other than Babcock & Wilcox had ever stepped onto the platform. The worker's burden does not, however, require proof that a particular girder or platform was used by employees of another subcontractor.

When the platforms were erected, guardrails were installed. This indicates that they were erected for use by human beings—otherwise there would have been no guardrails. The record does not indicate who caused the platforms to be installed. Nor does it appear what work was to be performed from the platforms. The platforms did not facilitate the installation of the pipes that Plummer's crew was installing. Indeed, the platforms were an impediment to the installation of

---

[24] *Id.,* p 104.

[25] In so concluding, we do not maintain that the platform was a common work area because, if it were to fall, it might hit workers working in another part of the catwalk system or working underneath this area.

the pipes. That is why they had been removed from the platform from which Plummer fell.

The platforms did not exist in isolation. A worker could not gain access to a platform unless he used the catwalk system. Plummer was on the platform not only because he was a Babcock & Wilcox employee but also because the catwalk—clearly a common work area—provided access to this work area.

The common work area formulation was an effort to distinguish between a situation where employees of a subcontractor were working in isolation from employees of other subcontractors and a situation where employees of a number of subcontractors were working in the same work area.

The record tends to show that employees of Babcock & Wilcox were working in proximity to employees of other subcontractors. At the time of the accident, four workers were positioned in the catwalk structure at an elevation just below the elevation from which Plummer's fall began. At least one of these other workers was a carpenter's helper, and thus not a Babcock & Wilcox pipe fitting employee. In addition, a Bechtel iron worker was working in the same catwalk structure at an elevation just above the point from which Plummer's fall began. Employees of different sub-contractors were clearly working in the catwalk system.

The common work area formulation did not contemplate a quilt work of common and non-common work areas—this fifty or hundred square feet suspended in the air being a common work area and an adjoining fifty or one hundred square feet not being a common work area.

The Edison and Bechtel inspectors did not view their responsibility as being dependent on whether

employees of two or more subcontractors had trod the same girder or this platform. It would not have occurred to Western or Suenkel that this was not an area of their responsibility.

The common work area formulation sought to distinguish between a case where it was appropriate to impose overall safety responsibility on the general contractor and one where it would not be appropriate. It does not depend on a matter of five, ten or fifteen feet, or who erected this platform, or whether an employee of another subcontractor was on this platform before Plummer. Indeed, workers were probably on the platform when it was first erected, with guardrails.

We conclude that there was sufficient evidence to justify the jury's verdict that the catwalk/platform system from which Plummer fell constituted a common work area.

B

We also conclude that there was sufficient evidence to support the jury's verdict that the unguarded platform was readily observable, and that the risk of falling, attendant to the absence of guardrails, was avoidable. The correct inquiry is not whether the accident was anticipated, but whether such an accident *should* have been.

The guardrails had been removed for a period of at least two weeks and were readily observable in a pile on the ground of the construction project. Gary Western, the Detroit Edison safety coördinator, acknowledged that he had observed the unguarded platform before the accident. Suenkel, the Bechtel safety coördinator, acknowledged that he was in the area; the jury could properly find that he too could have observed the unguarded platform. These safety coördinators acknowledged that

the unguarded condition was unsafe and should have been corrected.

Plummer presented statements from a co-worker and a Babcock & Wilcox safety supervisor that corroborated Plummer's testimony that there was no place safely to tie off. It thus cannot be said that the unguarded condition of the platform was not observable or that the accident could not have been avoided by putting in place, when the guardrails were removed from the platform, a wire to which Plummer and other workers who might use the platform could tie off, or that the failure to so safeguard the platform was not a cause, in addition to Plummer's inebriation, of the fall.

v

The Court of Appeals erred in substituting its assessment of the record for that of the jury.

Reversed.

CAVANAGH, C.J., and BRICKLEY, J., concurred with LEVIN, J.

BOYLE, J. I concur in Justice LEVIN's result. I write separately simply to reaffirm that the policy on which the duty recognized in *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974), is premised is the implementation of reasonable safeguards against high degrees of injury in common work areas at construction sites. *Id.* at 104. Where control is effectively retained, a relational obligation is created and a duty is recognized.[1] While the

---

[1] Although I agree that retention of control regarding safety may give rise to a duty, I do not adopt Justice LEVIN's explanation regarding the relationship between the duty and standard of care issues. Similarly, while I do not subscribe to all of the observations in part IV of Justice LEVIN's opinion, I agree with his conclusion that there was sufficient evidence to justify the jury's decision that this

existence of duty is a question of law, fact issues may be involved in application of the rule. Where varying inferences of fact are possible, the duty imposed will depend on the facts found. *Elbert v Saginaw,* 363 Mich 463, 469; 109 NW2d 879 (1961).

*Funk* provided that an owner who "acts in a superintending capacity and has knowledge of high degrees of risk faced by construction workers [is not absolved] from responsibility for failing to require observance of reasonable safety precautions" and may be held liable for its negligence. *Id.* at 106-107.

Detroit Edison has sought to buttress the Court of Appeals ruling by emphasizing that the evidence regarding its role in the project was "primarily contractual control, safety inspections, and general oversight." It has argued in this Court that there was no evidence demonstrating its involvement in the actual construction work. To be sure, not all courts agree that retention of control that is contractual alone or that pertains to safety aspects, rather than actual construction, warrants the imposition of a duty on an owner.[2] Detroit Edison's argument would limit the retained-control exception to instances where an owner actually exercised contractually retained control and that control pertained to the manner of con-

was a common work area. *Funk* does not require that two or more subcontractors actually be working at the same time in the same place.

[2] Compare *Wilson v Portland General Electric Co,* 252 Or 385, 395-396; 448 P2d 562 (1968) (the court concluded that because the right of the defendant to take over safety precautions did not increase the risk to the plaintiff, it could not render the defendant liable to the injured subcontractor's employee), with *Pasko v Commonwealth Edison Co,* 14 Ill App 3d 481; 302 NE2d 642 (1973) (the court found that a failure to properly exercise retained control over the safety aspects of the job may give rise to liability), and *Smith v United States,* 497 F2d 500 (CA 5, 1974) (a prime contractor was held to have retained control on the basis of contractual authority over safety procedures despite the fact that the contractor had not exercised that control).

struction, but not to control of details of construction relating to the safety aspects of the job.[3] The scope of duty recognized by this Court in *Funk* is limited; the limits are provided by the extent of control retained. Both contractual provisions between the owner, general contractor, and various subcontractors, and the actual control exercised are relevant considerations in determining whether an owner (or general contractor) retained control.

Justice GRIFFIN suggests that the imposition of a duty where control is retained only with respect to the safety aspects of the job presents the possibility that owners will forgo emphasis on worker safety. *Post,* pp 677-678. I cannot agree that the majority's result will cause responsible owners to disavow an interest in the safety of workers. Humane, economic, and public relations considerations all counsel against such a course of action.

Thus, an exception to the retention-of-control theory should not be made where the extent of control retained is limited to safety precautions to be provided on the construction site. The Arizona Supreme Court's discussion in *Lewis v Riebe Enterprises, Inc,* 170 Ariz 384; 825 P2d 5 (1992), considering the liability of a general contractor is instructive here. The *Lewis* court noted that interpreting § 414 in that manner "negates any contractual safety responsibility assumed" by the defendant. *Id.* at 392. Emphasizing that the division of authority in the area of safety may cause accidents by leaving uncertainty regarding whose responsibility various tasks are, the court concluded that, where a defendant contractually assumes the responsibility for safety at a work site, it is liable

---

[3] Because it is undisputed that Detroit Edison exercised contractual authority at least as it related to safety coördination and inspection, no question is presented regarding whether contractually retained authority alone suffices.

for any injury resulting from its negligent exercise of that responsibility as long as the general contractor (or owner) " '[knew] or by the exercise of reasonable care should [have known] that the subcontractors' work [was being done in a dangerous manner], and ha[d] the opportunity to prevent it by exercising the power of control which he . . . retained in himself.' " *Id.* at 392 quoting 2 Restatement Torts, 2d, § 414, comment (b), p 388.

The question whether Detroit Edison was negligent is dependent on the degree of control in fact retained by Detroit Edison. The scope of Detroit Edison's duty is limited by the extent to which it retained control. See *Lewis v Riebe Enterprises, Inc, supra,* pp 388-389. Thus, if it retained control solely to inspect the job site to determine that it received the benefit of the work for which it contracted, then its duty would be similarly limited.[4] In this case, conflicting inferences regarding the extent of retained control were possible.

The evidence regarding Edison's role at the site was sufficient for a jury to conclude that it retained control of the safety aspects of the job and that its negligence regarding those aspects was a proximate cause of plaintiff's injuries. Plaintiff presented evidence tending to show that Detroit Edison had extensive experience in constructing power plants, that it had 100 to 125 employees on the site, that it provided a safety coördinator who was at the site on a daily basis, and that the safety coördinator's job was to assure that each employer had an adequate safety program. Testimony was presented tending to show that Detroit Edison sought to centralize the flow of information necessary to ensure safety at the site. Further testi-

---

[4] An owner who retained control only for the purpose of inspecting work done to ensure receipt of that which was paid for is unlikely to be liable because the duty would be limited in this way.

mony was offered tending to prove that Detroit
Edison required subcontractors to carry out safety
programs, that it was involved in establishing the
content of weekly safety meetings held by subcon-
tractors, and that it was entitled to fire, or require
Bechtel to fire, any subcontractor not taking ap-
propriate precautions.

Thus, the trial court correctly submitted the
issue to the jury. *Bonin v Gralewicz,* 378 Mich 521,
526-527; 146 NW2d 647 (1966). The factfinder could
conclude from this evidence that Detroit Edison
retained control of the safety program. If the jury
drew this conclusion, then the court was obligated
to rule that Detroit Edison had a duty to ensure
that it carried out this responsibility without neg-
ligence. Whether Detroit Edison properly per-
formed its duties in that regard and whether any
failure proximately caused plaintiff's injuries were
also jury questions.

MALLETT, J., concurred with BOYLE, J.

RILEY, J. (*dissenting*). I write separately to indi-
cate my agreement with Justice COLEMAN's dis-
senting opinion in *Funk v General Motors Corp,*
392 Mich 91, 116; 220 NW2d 641 (1974), and
Justice RYAN's views in regard to *Funk* as ex-
pressed in *Beals v Walker,* 416 Mich 469; 331
NW2d 700 (1982).

I believe Justice COLEMAN was correct in reject-
ing the policy behind the *Funk* decision that was
"used to advance theories of employment relation-
ships which can render the property owner and
the general contractor *absolute insurers* for *any
injury* received by the employee of an independent
contractor." *Id.* at 116-117 (emphasis added). I
believe that such a theory represented "a signifi-
cant departure from time tested theories of tort
liability." *Id.* at 116.

Moreover, I am in accord with the conclusion reached by Justices RYAN, COLEMAN, and FITZGERALD in *Beals, supra* at 479, that *Funk* "has been overruled in light of the adoption of comparative negligence."

In light of the above, and on the basis of the facts presented in the matter before the Court today, I would affirm the Court of Appeals finding that there was insufficient evidence to establish that either defendant owed a duty to plaintiff or that such alleged duty was breached.

GRIFFIN, J. (*dissenting*). I share the views set forth by Justice RILEY. However, I write separately to register my concern that the majority's unwarranted expansion of *Funk* will not serve the public interest. *Funk v General Motors Corp,* 392 Mich 91; 220 NW2d 641 (1974).

The concept of "duty," in a negligence action, is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." Prosser & Keeton, Torts (5th ed), § 53, p 358. See also *Friedman v Dozorc,* 412 Mich 1, 22; 312 NW2d 585 (1981); *Duvall v Goldin,* 139 Mich App 342, 349; 362 NW2d 275 (1984).

In *Funk, supra* at 101, 102, the Court, while recognizing that "[o]rdinarily a landowner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated the task of erecting a structure," and while realizing that "[m]ishaps and falls are likely occurrences in the course of a construction project," nevertheless imposed a duty upon general contractors and owners

> to assure that reasonable steps within its supervisory and coördinating authority are taken to

guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen. [*Id.,* p 104.]

The policy considerations underlying that decision were described by the Court as follows:

> The policy behind the law of torts is more than compensation of victims. It seeks also to encourage implementation of reasonable safeguards against risks of injury.
> Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas. [*Id.*]

According to the *Funk* Court, its decision was set against the factual backdrop of an immediate employer who "conspicuously failed to provide any safety equipment," a general contractor who was "fully knowledgeable of the employer's dereliction," and an owner who "exercised an unusually high degree of control over the construction project from its very inception." *Id.,* pp 102, 105.

Now, in the present case, the majority of this Court has gone a long step further—and in my mind, a step too far—imposing liability in a situation where the owner and general contractor have taken the reasonable measures called for in *Funk* to insure the safety of construction workers on the project.

The defendant owner, Detroit Edison, created a centralized system of safety information for the project. It established the Depot Safety Organiza-

tion, which administered the dissemination of safety information and established a general first-aid facility. Each of the contractors on the job site was contractually required to operate safety programs for its employees. Those requirements were described by Edison's safety supervisor as follows:

> Each employer was required to have a program that would incorporate as a basic minimum, the requirements of all MIOSHA construction standards as well as any additional things that might be deemed generic to the site itself. Among that—in addition to that, each employer was required to conduct weekly safety meetings with every employee and that they were required to designate a competent employee of management that would act as their safety representative in any meetings requiring that knowledge be put forth to all the contractors in general.
>
> Information was disseminated to the safety representatives and then further passed on down to the employees, any information that would come up as far as potential problems that might be coming up on the site, if a large load was going to be lifted or this or that, something that might require specific attention of individual employees.
>
> Each employer was required to investigate accidents, to submit their injury reports to the first aid. There was one general first aid facility so that all contractors, all employers didn't have to supply their own. We wanted to try and centralize everything as much as we could with respect to the flow of information back from the contractors to make sure that they were in fact putting out the information and giving their employees what can be termed a reasonable [sic] safe place to work.

Edison coördinated the safety programs of the individual contractors and observed the basic safety operation throughout the project. The general contractor, Bechtel, implemented a Bechtel

safety program for Bechtel employees and moni-
tored the safety programs of other contractors.
Contractors such as plaintiff's employer, Babcock
& Wilcox, were contractually required to provide
Bechtel with a copy of their safety programs, to
conduct weekly safety meetings, and to provide
minutes or reports of those meetings. Babcock &
Wilcox did in fact conduct weekly safety meetings
over the six months during which plaintiff had
been on the project. Plaintiff attended every one of
those weekly safety meetings.

The imposition of liability on either Edison or
Bechtel defeats the ostensible goals underlying the
*Funk* decision—the call for owners and contractors
to provide "relatively safe working conditions" by
implementing "reasonable safety measures." *Funk,
supra,* pp 102-103. Both defendants in this case did
exactly that—they provided a safe work environ-
ment by creating safety programs and insuring
that all workers on the project were educated and
informed about safety concerns. Although the
present plaintiff, highly intoxicated at the time,
was involved in a serious accident, there is no
evidence in this record of continual or obvious
safety derelictions such as those to which the
Court pointed in *Funk.* Nonetheless, despite assur-
ances by the *Funk* Court that its ruling did not
portend the imposition of liability " 'upon every
property owner who enters into a construction
contract,' " *id.,* p 108, it appears now that owners
and contractors will be saddled with liability even
if they have implemented the presumed mandate
of *Funk.* The danger that lies in this precedent
was explained by an Oregon court,

> An owner who reserves the right to impose or
> require safety precautions for the benefit of his
> contractor's workmen derives no possible pecuni-

ary benefit from the reservation because he has contracted for a finished product. Therefore, if duties not otherwise required of owners are imposed because of the reservation of a right to require safety precautions, it is obvious that owners will not actively concern themselves with the workmen's safety. [*Wilson v Portland General Electric Co,* 252 Or 385, 396; 448 P2d 562 (1969). See also *Wienke v Ochoco Lumber Co,* 276 Or 1159; 558 P2d 319 (1976).]

Justice COLEMAN echoed this concern in her dissent in *Funk, supra,* p 116, when she stated:

The majority opinion creates concepts which represent a significant departure from time tested theories of tort liability. Landowners must now disavow all but the most casual personal interest in projects undertaken on their property or assume responsibility for any on-site injuries. General contractors must now be prepared to assume responsibility for any injury received by the employee of a subcontractor, no matter how negligent the employee may be.

Justice COLEMAN's observation applies with equal, if not greater, force to the case at hand. Because I conclude that the majority's decision constitutes the unwarranted expansion of an imprudent doctrine, I would affirm the decision of the Court of Appeals.