ORMSBY v CAPITAL WELDING, INC

Docket No. 233563. Submitted December 10, 2002, at Detroit. Decided January 24, 2003, at 9:00 A.M. Leave to appeal sought.

Ralph and Kimberly Ormsby brought an action in the Oakland Circuit Court against Capital Welding, Inc., Monarch Building Services, Inc., and others after Ralph Ormsby was injured while working for Abray Steel Erectors on a construction project in which Monarch was the general contractor, Capital was a subcontractor, and Abray was a subcontractor to Capital. The plaintiffs alleged that Capital and Monarch failed to employ careful management personnel, violated their nondelegable duty to provide a safe workplace, retained control of and negligently supervised and inspected the workplace, failed to warn of hazardous methods of work, incorporated defective or insufficient structural steel, and acquiesced to unsafe construction activities. Monarch filed a cross-claim against Capital for indemnification pursuant to the terms of their contract should Monarch be found liable to the plaintiffs. The court, Alice L. Gilbert, J., granted summary disposition for Capital and Monarch, ruling that the retained control theory applies only in situations involving common work areas, that the plaintiffs failed to allege that the injury occurred in a common work area, that the plaintiffs could not succeed with their retained control claims based on the contract between the building owner and Monarch and the contract between Monarch and Capital because Ralph Ormsby was not a third-party beneficiary of those contracts, and that Ralph Ormsby was not engaged in an inherently dangerous activity at the time of injury. The trial court also granted summary disposition for Capital on Monarch's cross-claim and denied plaintiffs leave to amend their complaint to allege that the injury occurred in a common work area and that Ralph Ormsby was a third-party beneficiary of the contract between Monarch and Capital. The plaintiffs appealed, and Monarch cross-appealed.

The Court of Appeals *held*:

1. As a general rule, a general contractor is not liable for harm caused by the negligence of a subcontractor. In three exceptions to the rule, a general contactor is subject to direct liability where it retains control of the work, where there are readily observable and

avoidable dangers in common work areas that create a high degree of risk to a significant number of workers, and where the work is inherently dangerous.

2. In order for the retained control theory to apply, the general contractor must not only possess supervisory and coordinating authority over the job site, but must actually exercise this authority and affect the manner or environment in which the work is performed. In this case, with respect to the plaintiffs' retained control claims, the trial court did not err in granting summary disposition for Monarch, but erred in granting summary disposition for Capital. An issue of fact, sufficient to preclude summary disposition, exists with respect to whether Capital exercised actual control over the manner in which Ralph Ormsby performed his work. In contrast, evidence presented by the plaintiffs that Monarch had general oversight is insufficient to establish that Monarch retained control.

3. A general contractor may be held directly liable for a subcontractor's negligence where the general contractor fails to take reasonable precautions against readily observable, avoidable dangers in common work areas that create a high degree or risk to a significant number of workers. A common work area is one where the employees of two or more subcontractors will eventually work. In this case, the trial court erred in granting summary disposition for Monarch and Capital with respect to the plaintiffs' common work area claims inasmuch as there was a genuine issue of fact concerning whether Ralph Ormsby's injury occurred in a common work area. In light of such factual issue, the trial court also erred in denying the plaintiffs' motion to amend their complaint to allege that the injury occurred in a common work area.

4. A general contractor may be held directly liable for a subcontractor's negligence where the harm results from work necessarily involving danger to others, unless great care is used to prevent injury, or where the work involves a peculiar risk or special danger that calls for special or reasonable precautions. The risk of danger must be recognizable at the time the contract is made. In this case, the trial court did not err in granting summary disposition for Monarch and Capital with respect to the plaintiffs' claims of inherently dangerous activity. The evidence demonstrated that the danger arose from Ralph Ormsby's act of improperly stacking decking on unwelded roof joists, rather than from a peculiar risk or special danger involved in the work generally. Additionally, the plaintiffs failed to present any evidence that the danger of unwelded roof joists shifting was a danger recognizable at the time the contract was made.

5. The trial court did not err in granting summary disposition for Capital with respect to Monarch's cross-claim for contractual indemnification. The indemnification agreement unambiguously provides that Capital must indemnify Monarch only for claims arising from the negligent acts or omissions of Capital and its subcontractors. Monarch cannot seek indemnification for claims arising out of its own negligence.

Affirmed in part and reversed in part.

NEGLIGENCE — GENERAL CONTRACTORS — SUBCONTRACTORS.

A general contractor generally is not liable for harm caused by the negligence of a subcontractor; exceptions to this rule exist where the general contractor retains control of the work, where there are readily observable and avoidable dangers in common work areas that create a high degree of risk to a significant number of workers, and where the work is inherently dangerous.

*Miller & Padilla, P.C.* (by *Neil A. Miller*) (*Sommers, Schwartz, Silver & Schwartz, P.C.*, by *Patrick Burkett*, of counsel), for Ralph and Kimberly Ormsby.

*Joseph J. Wright, PLLC* (by *Joseph J. Wright*), for Capital Welding, Inc.

*Pedersen, Keenan, King, Wachsberg & Andrzejak, P.C.* (by *Michael M. Wachsberg*), for Monarch Building Services, Inc.

Before: KELLY, P.J. and JANSEN and DONOFRIO, JJ.

KELLY, P.J. In this negligence case, plaintiff[1] appeals an order granting summary disposition in favor of defendants Capital Welding, Inc., and Monarch Building Services, Inc. Monarch cross-appeals an order granting Capital's motion for summary disposition of Monarch's cross-claim against Capital. We affirm in part and reverse in part.

---

[1] Because plaintiff Kimberly Ormsby alleged a derivative claim of loss of consortium, we use the singular term "plaintiff" to refer to plaintiff Ralph Ormsby.

I. BASIC FACTS AND PROCEDURAL HISTORY

The injury giving rise to this claim occurred while plaintiff, a journeyman iron worker with fourteen years' experience, was working at a construction site owned by defendant Rite-Aid of Michigan at which Monarch was the general contractor and Capital a subcontractor that, in turn, subcontracted with plaintiff's employer, Abray Steel Erectors.

Rite-Aid and Monarch had a written contract (Rite-Aid/Monarch contract) that set forth Monarch's obligations. In relevant part, the contract provided that Monarch was "solely responsible for all construction means, methods, techniques, sequences and procedures for coordinating all portions of the Work under the Agreement" and "responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the Work." The contract also provided that Monarch must take "all reasonable precautions for safety of, and shall provide all reasonable protection to prevent damage, injury or loss to . . . all employees on the Work and all other persons who may be affected thereby" and "shall erect and maintain, as required by existing conditions and progress of the Work, all reasonable safeguards for safety protection." The contract also provided that Monarch agreed to "not load or permit any part of the Work to be loaded so as to endanger safety."

Similarly, Monarch and Capital had a written contract (Monarch/Capital contract) that set forth Capital's obligations. This contract provided, in relevant part: "The Subcontractor shall take reasonable safety precautions with respect to performance of this Subcontract, shall comply with safety measures initiated by the Contractor and with applicable laws, ordi-

nances, rules, regulations and orders of public authorities for the safety of persons or property in accordance with the requirements of the Prime Contract." The Monarch/Capital contract also provided that Capital would indemnify Monarch against claims arising from the performance of Capital's work.

Plaintiff, the foreman on the site, began work on the single-story steel-framed structure the day before his injury occurred. Because one side of the building had already been erected, plaintiff was instructed to erect the other side. Plaintiff began construction by standing up columns, making the beams and "landing" the joists[2] and the decking.[3] Plaintiff loaded the decking on the joists that had not yet been welded or bolted, but had been C-clamped in place.

Plaintiff testified that the joists supplied for the job were not manufactured to be bolted, something he had not seen before. Alex Stadler, an employee of Capital and the site's project manager, instructed plaintiff to fabricate lugs[4] from angle iron to weld to the columns as a substitute. At some point during the execution of this task, plaintiff stood on a bundle of decking that had been loaded onto the joists. As he stood on the decking, he prepared the joists for welding by spacing them. As he attempted to space a joist by hitting it with a sledgehammer, the joists and

---

[2] A joist is "any number of small, parallel beams of timber, steel, reinforced concrete, etc., for supporting floors, ceilings, or the like." *Random House Webster's Unabridged Dictionary* (2d ed, 1998).

[3] On appeal, plaintiff contends that he fell from joists and decking that were stacked by another crew. However, his deposition testimony indicates that another crew landed the joists and stacked the decking on the other side of the building, but that plaintiff landed the joists and stacked the decking on the side where he was working and from which he fell.

[4] A lug is "a projecting piece by which anything is held or supported." *Random House Webster's Unabridged Dictionary* (2d ed, 1998).

decking on which he stood shifted, causing him to fall and sustain injuries. Plaintiff testified that a mason was working "right below" him when the structure collapsed.

Plaintiff filed a complaint against Capital, alleging that it negligently failed to employ careful management personnel, violated its nondelegable duty to provide a safe place to work, retained control of and negligently supervised and inspected the workplace, failed to warn of hazardous methods of work, incorporated defective or insufficient structural steel, and acquiesced to unsafe construction activities, including loaded unwelded bar joists. Plaintiff later amended the complaint to add identical claims against Monarch.

Capital moved for summary disposition of plaintiff's claims pursuant to MCR 2.116(C)(8) and (C)(10). Capital argued that there was no genuine issue of fact regarding whether Capital retained control over the work performed and whether the work was inherently dangerous. With respect to whether Capital retained control, Capital argued that Abray retained control over plaintiff's work, that the Monarch/Capital contract did not establish that Capital retained control, and that plaintiff could not establish that Capital retained control because plaintiff was not injured in a common work area.

Plaintiff argued that Capital was liable on the basis of the Monarch/Capital contract provision that Capital "shall be solely responsible for all construction means, methods, techniques, sequences and procedures." Plaintiff also argued that the evidence demonstrated that Capital "dictated the means and methods of erecting the steel." Plaintiff further argued that the activity was inherently dangerous.

The trial court granted Capital's motion. Combining the retained control and common work area theories, the trial court determined that "the retained control theory applies only in situations involving 'common work areas.' " The trial court found that (1) plaintiff failed to allege that his injury occurred in a common work area and (2) "there is no evidence that other subcontractors would work on the erection of the steel structure." The trial court also found that plaintiff could not succeed with his retained control claim based on the Rite-Aid/Monarch and Monarch/Capital contracts because he was not a third-party beneficiary of those contracts. The trial court also dismissed plaintiff's inherently dangerous activity claim, finding that there was no evidence suggesting that plaintiff's work was other than "a routine construction job."

Monarch filed a cross-claim against Capital for indemnification based on the Monarch/Capital contract. Monarch alleged: "In the unlikely event Cross-Plaintiff is found to be liable to Plaintiff or any Co-Defendant, it would be entitled to full and complete expressed contractual indemnification for any damages sustained by Plaintiff . . . including any judgment, cost, interest and attorney fees." Pursuant to MCR 2.116(C)(10), Capital moved for summary disposition of Monarch's cross-claim for indemnification for Monarch's own liability. Monarch also filed a motion for summary disposition pursuant to MCR 2.116(C)(10), arguing that plaintiff, an employee of Abray, was injured by his own negligence; therefore, Capital was contractually obligated to indemnify Monarch against plaintiff's claims. The trial court granted Capital's motion and denied Monarch's motion. The trial court found that the Monarch/Capital contract obligated Capital to indemnify Monarch only for

claims arising from Capital's negligence. The trial court found that because Capital was dismissed from the case, Monarch could not seek indemnification for claims arising only from Monarch's own negligence.

Monarch also filed a motion for summary disposition of plaintiff's claims, arguing that the trial court's previous ruling required it to grant summary disposition with respect to plaintiff's claims against Monarch. The trial court granted this motion for the reasons stated in its previous order granting summary disposition to Capital.

Plaintiff moved for leave to amend his complaint to allege that his injuries occurred in a common work area and that he was a third-party beneficiary of the Monarch/Capital contract. The trial court denied this motion, ruling that the amendment would be futile in view of its prior rulings.

## II. STANDARD OF REVIEW

We review the grant or denial of a motion for summary disposition de novo. *Haliw v Sterling Hts*, 464 Mich 297, 301-302; 627 NW2d 581 (2001). In reviewing a motion for summary disposition brought under MCR 2.116(C)(10), the court must consider the affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties in the light most favorable to the party opposing the motion. *Haliw*, *supra* at 302. Summary disposition may be granted if the evidence demonstrates that there is no genuine issue with respect to any material fact, and the moving party is entitled to judgment as a matter of law. *Id*. Summary disposition pursuant to MCR 2.116(C)(8) tests the legal suffi-

ciency of a claim by the pleadings alone; the motion may not be supported with documentary evidence.

### III. GENERAL CONTRACTOR LIABILITY

Generally, the employer of an independent contractor is not liable for harm caused to another by the subcontractor or its servants. *Groncki v Detroit Edison Co*, 453 Mich 644, 662; 557 NW2d 289 (1996) (BRICKLEY, C.J.); *Hughes v PMG Building, Inc*, 227 Mich App 1, 5; 574 NW2d 691 (1997); *Signs v Detroit Edison Co*, 93 Mich App 626, 632; 287 NW2d 292 (1979); 2 Restatement Torts 2d, § 409, p 370. However, there are circumstances under which an employer can be directly liable for its failure to exercise reasonable care.

The three exceptions implicated in this appeal are: (1) when the general contractor retains control over the work, *Phillips v Mazda Motor Mfg (USA) Corp*, 204 Mich App 401, 408; 516 NW2d 502 (1994); (2) where there are readily observable and avoidable dangers in common work areas that create a high degree of risk to a significant number of workers, *Funk v Gen Motors Corp*, 392 Mich 91, 104; 220 NW2d 641 (1974), overruled in part on other grounds *Hardy v Monsanto Enviro-Chem Systems, Inc*, 414 Mich 29; 323 NW2d 270 (1982); and (3) where the work is inherently dangerous, *Phillips, supra* at 406.

### A. RETAINED CONTROL

The retained control exception departs from the law that a master is liable for the negligence of his servant, imposing liability in circumstances that do not implicate a master-servant relationship.

> "If the employer of an independent contractor retains control over the operative detail of doing any part of the work, he is subject to liability for the negligence of the employees of the contractor engaged therein, under the rules of that part of the law of Agency which deals with the relation of master and servant. The employer may, however, retain a control less than that which is necessary to subject him to liability as a master. He may retain only the power to direct the order in which the work shall be done, or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others." [*Plummer v Bechtel Constr Co*, 440 Mich 646, 660, n 17; 489 NW2d 66 (1992) (LEVIN, J.), quoting 2 Restatement Torts 2d, §§ 414, comment a, p 387.]

Thus, where an employer retains less control than that of a master, but enough supervisory control, the law may impose a duty to exercise this control with reasonable care to prevent the work from causing injury.

### B. COMMON WORK AREA

Similarly, the common work area exception articulated in *Funk* imposes direct liability on the general contractor because it is " 'in a position to coordinate work or provide expensive safety features that protect employees of many or all of the subcontractors.' " *Funk, supra* at 104, quoting *Alber v Owens*, 66 Cal 2d 790, 796; 59 Cal Rptr 117; 427 P2d 781 (1967). In *Funk*, the Supreme Court held that the general contractor had a duty "to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable

dangers in common work areas which create a high risk to a significant number of workmen." *Id.* at 104. Later, in *Plummer* the Court cautioned this Court that the employer's duty does not depend on the subcontractor's "behavior or fault." *Plummer, supra* at 656 (LEVIN, J.).

## C. INHERENTLY DANGEROUS

An employer can also be held directly liable for an injury that results from work that is inherently dangerous. In the seminal case on this exception, our Supreme Court stated:

> [This exception] is not applied to those cases where the injuries occur which are collateral to the employment, like the dropping of material by the servant of a contractor upon a person passing by, but where a duty is imposed upon the employer in doing work necessarily involving danger to others, unless great care is used, to make such provision against negligence as may be commensurate with the obvious danger. It is this duty which cannot be delegated to another so as to avoid liability for its neglect. [*Inglis v Millersburg Driving Ass'n,* 169 Mich 311, 321-322; 136 NW 443 (1912).]

The doctrine is " 'closely akin to, but not exactly the same as, strict liability.' " *Bosak v Hutchinson,* 422 Mich 712, 726; 375 NW2d 333 (1985), quoting *Vannoy v City of Warren,* 15 Mich App 158, 163; 166 NW2d 486 (1968).

## D. COMMON WORK AREA AND RETAINED CONTROL

With respect to the retained control and common work area exceptions, this Court has applied them as two separate exceptions, but also, as one single

exception. In this case, the trial court found that a
common work area was a required element of the
retained control exception. To determine the correct
application of these exceptions, we look to *Funk* and
its progeny.

In *Funk*, the Supreme Court discussed the liability
of an owner and a general contractor for failure to
implement reasonable safety measures. *Funk, supra*
at 100-105. In facts similar to those in this case, the
plaintiff climbed onto steel beams from where he
hammered hooks. *Id.* at 100. When he attempted to
remove roof slabs, he fell thirty feet to the ground
and sustained injuries. *Id.* As in this case, "The imme-
diate cause of the accident was the manner in which
[the plaintiff] chose to complete the assigned task."
*Id.* The plaintiff sued the defendant owner and the
defendant general contractor for failure to implement
reasonable safety precautions for men working over
thirty feet above the ground. *Id.*

The Supreme Court addressed the liability of the
owner and the general contractor separately. In
addressing the liability of the general contractor, the
Court stated:

> Placing ultimate responsibility on the general contractor
> for job safety in common work areas will, from a practical,
> economic standpoint, render it more likely that the various
> subcontractors being supervised by the general contractor
> will implement or that the general contractor will himself
> implement the necessary precautions and provide the nec-
> essary safety equipment in those areas.
>
> *       *       *
>
> We regard it to be part of the business of a general con-
> tractor to assure that reasonable steps within its supervi-
> sory and coordinating authority are taken to guard against

readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen. [*Id.* at 104.]

While the Court found that a general contractor could be liable if it failed to implement reasonable safety measures under the circumstances quoted above, it went on to state: "This analysis would not ordinarily render a 'mere' owner liable. In contrast with a general contractor, the owner typically is not a professional builder. Most owners visit the construction site only casually and are not knowledgeable concerning safety measures." *Id.* at 104-105. Then, addressing whether the defendant owner, General Motors, could be held liable, the Court applied the retained control theory to find liability because "General Motors exercised an unusually high degree of control over the construction project from its very inception." *Id.* at 105. Thus, the Court discussed the common work area exception with respect to the defendant general contractor, but only applied the retained control exception to the defendant General Motors.

In *Erickson v Pure Oil Corp*, 72 Mich App 330, 336; 249 NW2d 411 (1976), this Court opined that "[t]he frequently recurring use of the phrase 'common work area' in *Funk* suggests that the Supreme Court desired to limit the scope of a general contractor's supervisory duties and liability to injuries which occur in 'common work areas.' " Applying *Funk's* common work area test to a claim of general contractor liability, this Court found that there was a genuine issue of fact regarding whether the plaintiff's injury occurred in a common work area. *Id.* at 336-338.

However, this Court went on to discuss the owner's liability stating:

> Before an owner of a construction project can incur liability for an on-the-site injury to a subcontractor's employee one of two conditions must be met. First, there is liability if the owner is negligent in its selection of the general contractor. Second, the owner is liable if it retains sufficient control over the project so that it can be said that the owner effectively controls the project and not the general contractor. [*Id.* at 338 (citations omitted).]

Thus, this Court distinguished the retained control and common work area exceptions and applied them separately.

Similarly, in *Signs*, this Court addressed general contractor liability based on retained control even though it found that the plaintiff was not injured in a common work area. *Signs, supra* at 635-642. The Court rejected the plaintiff's argument that the general contractor was liable under the four-part test of *Funk* because the evidence did not suggest that more than one subcontractor worked on the site. *Id.* at 635. However, the Court proceeded to discuss the general rule of general contractor nonliability, noting that there are exceptions and exclusions. "An employer may come within an exception to the rule and be vicariously liable. But, the employer may also be within an exclusion to the rule and be personally liable." *Id.* at 638. The Court recognized retained control, as set forth in 2 Restatement Torts, 2d, § 414, p 387, as an exclusion from the general rule of nonliability. *Signs, supra* at 638, citing *Misiulis v Milbrand Maintenance Corp*, 52 Mich App 494, 498-499; 218 NW2d 68 (1974). Ultimately, the Court found evidence that the general contractor retained sufficient control

over the site to give rise to a duty to exercise reasonable care. *Signs, supra* at 640-642.

Departing from this line of cases, this Court then blended the retained control and common work area exceptions. In *Samhoun v Greenfield Constr Co, Inc*, 163 Mich App 34, 45; 413 NW2d 723 (1987), this Court stated: "An owner or contractor may be subject to liability when an employee of a subcontractor is injured if the owner or contractor sufficiently retains control of the subcontractor's activities. This doctrine was introduced in *Funk* . . . ." This Court proceeded to apply the four-part common work area test of *Funk*. *Id.* at 45-46.

In *Plummer*, our Supreme Court clarified that the retained control and common work area exceptions are two distinct exceptions. In so doing, it referenced the purpose behind each exception. *Plummer, supra* at 661-662, 667 (LEVIN, J.). With respect to the retained control exception,

> [t]he line drawn in the Restatement commentary seeks to differentiate between a situation where the subcontractor "need not" follow the suggestions or recommendations of the owner/general contractor . . . and a situation where the right of supervision retained by the owner/general contractor is such that the subcontractor is not "entirely free" to ignore suggestions and recommendations. [*Id.* at 661-662.]

With respect to the common work area exception,

> [t]he common work area formulation was an effort to distinguish between a situation where employees of a subcontractor were working in isolation from employees of other subcontractors and a situation where employees of a number of subcontractors were working in the same work area. [*Id.* at 667.]

Thus, because the two exceptions derived from two different reasons for abrogating the general rule of employer nonliability, it is appropriate to apply them as separate exceptions.

In *Johnson v Turner Constr Co*, 198 Mich App 478, 480; 499 NW2d 27 (1993), this Court again addressed the retained control and common work area exceptions separately:

> However, a general contractor may be held liable when it retains control of the work. Furthermore, a general contractor may be found liable if it fails reasonably to guard against readily observable, avoidable dangers in the common work areas that create a high degree of risk to a number of workers.[1]

---

[1] This is true regardless of the amount of control the general contractor retained because inherent in the general contractor-subcontractor relationship is the general contractor's supervisory and coordinating authority wherein ultimate responsibility for job safety in common work areas is placed. [Citations omitted.]

---

Although the opinion could have been clearer, this Court's separation of the two exceptions is evident from the syntax and context and is further clarified by the footnote.

This Court also addressed the retained control and common work area exceptions separately in *Phillips, supra* at 408. In addressing whether the general contractor and owner could be liable under the common work area theory, this Court applied the *Funk* four-part test. *Id.* at 407.

> The common work area rule provides that a general contractor may be liable for a subcontractor's negligence where

the general contractor fails to take reasonable precautions against "readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen." [*Id.* (citations omitted).]

In addressing whether the general contractor and owner could be liable under the retained control theory, this Court applied a separate rule:

A general contractor or landowner may be held liable for a subcontractor's negligence where the general contractor or landowner effectively retains control over the work involved. There must be a high degree of actual control; general oversight or monitoring is insufficient. [*Id.* at 408 (citations omitted).]

Similarly, in *Groncki*, the Supreme Court addressed the plaintiff's allegation that a defendant was "liable as a general contractor under this Court's decision in *Funk*." *Groncki, supra* at 653 (BRICKLEY, C.J.). In so doing, it set forth a four-part test that does not mention or even implicate the retained control exception:

Thus, for there to be liability under *Funk*, there must be: 1) a general contractor with supervisory and coordinating authority over the job site, 2) a common work area shared by the employees of more than one subcontractor, and 3) a readily observable and avoidable danger in the common work area, 4) that creates a high degree of risk to a significant number of workers. [*Id.* at 662.]

Notably, the Court did not discuss the retained control exception in conjunction with this four-part test or, for that matter, anywhere in its opinion.

In *Hughes, supra* at 8, this Court discussed the common work area exception, citing *Funk* and the four-part test in *Groncki* without reference to retained control. After determining that the plaintiff's

injury did not occur in a common work area, this Court discussed the theory behind the common work area exception:

> We thus read the common work area formulation as an effort to distinguish between a situation where employees of a subcontractor were working on a unique project in isolation from other workers and a situation where employees of a number of subcontractors were all subject to the same risk or hazard. See *Plummer, supra* at 667. In the first instance, each subcontractor is generally held responsible for the safe operation of its part of the work. In the latter case, where a substantial number of employees of multiple subcontractors may be exposed to a risk of danger, economic considerations suggest that placing ultimate responsibility on the general contractor for job safety in common work areas will "render it more likely that the various subcontractors . . . will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas." *Funk, supra* at 104. [*Id.* at 8-9.]

Most recently, in *Kubisz v Cadillac Gage Textron, Inc*, 236 Mich App 629, 636; 601 NW2d 160 (1999), this Court discussed retained control as a "second main exception" to the general rule of nonliability for the negligence of an independent contractor. This Court found that there was an issue of fact regarding whether the defendant retained sufficient control over the plaintiff's work because the defendant's shop manager controlled the daily operations at the site and admitted that he managed the development and manufacture of the vehicle that resulted in the plaintiff's injury. This Court did not apply or mention the four-part test in *Funk* or address whether the plaintiff's injury occurred in a common work area.

Nonetheless, this Court in *Candelaria v BC Gen Contractors, Inc*, 236 Mich App 67, 74; 600 NW2d 348 (1999), citing *Plummer, supra, Groncki, supra, Hughes, supra, Samhoun, supra, and Erickson, supra*, and quoting *Funk*, stated "The doctrine of retained control applies only in those situations involving 'common work areas.'" We believe there has been some confusion regarding the analysis and language used in *Candelaria*. This may have led to what we consider is the trial court's misapplication of *Candelaria* in the instant case.

It is not our understanding, and we do not believe, that *Candelaria* eliminated an exception to nonliability by a general contractor or owner. Instead, we construe *Candelaria* as an attempt to draw a distinction between the degree of retained control that would impose liability on the employer under the retained control exception and the concept of "supervisory and coordinating authority," also a type of retained control as recognized in the first prong of the four-part test enunciated in *Funk* in the analysis of common work area liability.

Specifically, *Candelaria* states the control necessary for an owner or general contractor to be held liable pursuant to the retained control exception is as follows:

> Although formulations such as "high degree of actual control" and "dominant role" suggest a fact-specific inquiry, one clear rule can be gleaned from *Funk* and its progeny. At a minimum, for an owner or general contractor to be held directly liable in negligence, its retention of control must have had some *actual effect* on the manner or environment in which the work was performed. [*Candelaria, supra* at 76 (emphasis in original).]

On the other hand, clearly all that is required under the first prong of the *Funk* common work area test is "supervisory and coordinating authority over the job site." *Groncki, supra* at 662. We construe the distinction simply as the difference between active and passive control, meaning that for direct liability under the retained control exception, the owner or general contractor must not only possess "supervisory and coordinating authority over the job site," as is required for the first prong of the *Funk* common work area test, but must actually exercise this authority and affect the manner or environment in which the work is performed.

In other words, when the contractor's role is limited only to the right of "supervisory and coordinating authority," e.g. passive control, then the remaining three parts of the *Funk* test for common work area liability must also be established. We read the phrase "retained control" in *Candelaria* in the context of passive involvement in an alleged common work area as contrasted with retained control having an active or actual effect on the manner the work was performed. The contractor's involvement in *Candelaria* was limited to "supervisory and coordinating authority" without actual effect on the manner or environment in which the work was performed. Accordingly, the plaintiff's cause of action in *Candelaria* failed for want of a common work area. Therefore, when the Court in *Candelaria, supra* at 74, stated, "The doctrine of retained control applies only in those situations involving 'common work areas,'" we interpret this to mean that retained control, only in those circumstances when that control amounted to "supervisory and coordinating authority," must necessarily

involve situations that implicate the common work area exception.

IV. ANALYSIS

Plaintiff argues that the trial court erred in granting summary disposition of his claims against Capital and Monarch that are based on exceptions to general contractor nonliability. We agree in part.

A. RETAINED CONTROL

Plaintiff first argues that there was a genuine issue of fact regarding whether Capital and Monarch retained control over his work.[5] We agree with respect to Capital, but disagree with respect to Monarch.

A general contractor must exercise a "high degree of actual control" to be liable under this theory; general oversight or monitoring is insufficient. *Phillips, supra* at 408; see also *Burger v Midland Cogeneration Venture*, 202 Mich App 310, 317; 507 NW2d 827 (1993); *Samodai v Chrysler Corp*, 178 Mich App 252, 256; 443 NW2d 391 (1989). Plaintiff argues that the Monarch/Capital contract demonstrates that Capital retained control over his work. However, while a contractual obligation to control a work site is relevant in determining whether a general contractor retained control, *Plummer, supra* at 671, the contractual obligation alone is not sufficient, *Samodai, supra* at 256. The contractor must "retain at least partial control and direction of *actual* construction work, which is

---

[5] Whether a general contractor retained control is generally a question of fact for the jury. *Phillips, supra* at 408.

not equivalent to safety inspections and general oversight." *Id.* (emphasis in original). Therefore, plaintiff could not demonstrate retained control through the Monarch/Capital contract provisions alone.

However, plaintiff also introduced other evidence demonstrating that Capital retained control over his work. Plaintiff had only been working on the site for two days. On the second day, he encountered a problem involving columns with missing lugs. Apparently, the steel columns supplied by Capital had been incorrectly fabricated. Plaintiff testified that his supervisor did not instruct him on solving this problem. Rather, Stadler, Capital's project manager, gave plaintiff a piece of angle iron "and said, I want you to fabricate the lugs out of this and weld them on the columns so that the columns can be made to go plumb." Plaintiff further testified, "if the superintendent[6] on the job tells you they want something done, then you're pretty much obligated to do that really." Thus, Stadler's direction to plaintiff had an effect on the manner in which plaintiff performed his job. Viewing this evidence together with the contractual obligations assumed by Capital, in the light most favorable to plaintiff, we find that an issue of fact exists with respect to whether Capital exercised actual control over the manner in which plaintiff performed his work. Therefore, the trial court erred in granting summary disposition of plaintiff's claim against Capital, which claim was based on the retained control exception.

With respect to Monarch, plaintiff presented no evidence that it retained control. Plaintiff argues that

---

[6] Plaintiff referred to Stadler as a "superintendent" rather that his correct title of project manager.

Monarch's construction superintendent, Scott Redding, and Monarch's project manager, Larry Mendenhall, admitted that Monarch or its agents had primary safety and supervisory duties responsibility. However, general oversight and safety standards alone are insufficient to constitute retained control. *Johnson, supra* at 480. Therefore, the trial court did not err in granting summary disposition of plaintiff's claim against Monarch based on the retained control exception.

### B. COMMON WORK AREA

Plaintiff also argues that there was a genuine issue of fact regarding whether he was injured in a common work area.[7] We agree.

As noted above, the trial court held that plaintiff failed to state a claim under this theory because he did not plead this theory or allege any facts to support it. Nonetheless, the trial court ruled, "This Court finds that there was no common work area that created a high degree of risk to a significant number of workers" and "there is no evidence that other subcontractors would work on the erection of the steel structure." The trial court did not address each of the factors in the common work area test. Although the trial court found that there was no "high degree of risk," it did not first determine whether the evidence showed that there was a readily observable and avoidable danger in the common work area. Therefore, it appears that the dispositive factor addressed by the trial court was whether the evidence showed

---

[7] Whether an injury occurred in a common work area is generally a question of fact for the jury. *Groncki, supra* at 663.

that plaintiff was injured in a common work area. We limit our discussion and decision to this question because it is the only one properly preserved for appeal. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999).

For a common work area to exist, there must be an area where the employees of two or more subcontractors will eventually work. *Groncki, supra* at 663; *Phillips, supra* at 408. The evidence demonstrated that Abray personnel and employees of other subcontractors would be or had been working in the same area where plaintiff's injury occurred. This evidence creates a genuine issue of fact regarding whether plaintiff's injury occurred in a common work area. Therefore, the trial court erred in granting to Capital and Monarch summary disposition of plaintiff's claim based on the common work area exception.

On the basis of this determination, we also find that the trial court erred in denying plaintiff's motion, pursuant to MCR 2.118(A)(2), to amend his complaint to add the common work area claim. The trial court's sole reason for denying plaintiff's motion was that an amendment would be futile in view of the trial court's prior ruling. Because we find that the trial court erred in ruling that there was no genuine issue of fact regarding whether plaintiff's injury occurred in a common work area, plaintiff's amendment to add a common work area claim would not be futile.

### C. INHERENTLY DANGEROUS

Plaintiff also argues that there was a genuine issue of fact regarding whether the work he performed was inherently dangerous. We disagree.

The Restatement of Torts, 2d, defines inherently dangerous activity in two overlapping sections. *Bosak, supra* at 726. Section 416 refers to "peculiar risk":

> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise. [2 Restatement Torts, 2d, § 416, p 395.]

Section 427 refers to "special danger":

> One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger. [2 Restatement Torts, 2d, § 427, p 415.]

From these sections derived the inherently dangerous rule:

> [A]n employer is liable for harm resulting from work "necessarily involving danger to others, unless great care is used" to prevent injury, . . . or where the work involves a "peculiar risk" or "special danger" which calls for "special" or "reasonable" precautions. . . . It must be emphasized, however, that the risk or danger must be "recognizable in advance," *i.e.*, at the time the contract is made, for the doctrine to be invoked. [*Bosak, supra* at 727-728.]

Plaintiff argues that there was a genuine issue of fact regarding whether the work he performed was

inherently dangerous because the evidence demonstrated that he was working on steel eighteen feet above the ground on an unstable surface with no protection against the risk of falling. Generally, when evidence is presented respecting the hazardous elements of a job, the determination of whether the job is inherently dangerous is a jury question. *Burger, supra* at 316. However, the mere fact that the job site is hazardous or involves risk of serious injury does not necessarily create a question of fact regarding liability for breach of a nondelegable duty to guard against injury from an inherently dangerous activity.

In this case, the evidence demonstrated that the danger arose because plaintiff improperly stacked decking on the unwelded roof joists, rather than from a "peculiar risk" or "special danger" involved in the work generally. See *Kulp v Verndale Products, Inc (On Remand)*, 193 Mich App 524, 530-531; 484 NW2d 699 (1992). Additionally, plaintiff failed to present any evidence that the danger of unwelded roof joists shifting was a danger recognizable at the time the contract was made. Moreover, Monarch hired someone who was responsible and experienced in this type of work. Plaintiff was a journeyman ironworker with fourteen years' experience. Abray was uniquely qualified as a company that erects steel structures. The work plaintiff performed when he was injured was routine for his profession.

Plaintiff also argues that witnesses testified that they consider steel erection to be inherently dangerous work. However, a layperson's use of the phrase "inherently dangerous" to describe plaintiff's work does not create an issue of fact regarding whether plaintiff's work was, under the legal definition, "inherently dangerous." Plaintiff failed to cite any testimony

that the work presented a peculiar risk or a special danger known at the time of contracting that called for special or reasonable precautions. Therefore, the trial court did not err in granting summary disposition of plaintiff's claim under the inherently dangerous exception.

### V. MONARCH'S CROSS APPEAL

Monarch argues that the trial court erred in granting Capital's motion for summary disposition of Monarch's cross-claim for indemnification against Capital. We disagree.

Monarch filed a cross-complaint against Capital alleging, "In the unlikely event Cross-Plaintiff is found to be liable to Plaintiff or any Co-Defendant, it would be entitled to full and complete expressed contractual indemnification for any damages sustained by Plaintiff . . . including any judgment, cost, interest and attorney fees." Pursuant to MCR 2.116(C)(10), Capital moved for summary disposition of Monarch's cross-claim for indemnification for Monarch's own liability. The trial court granted Capital's motion, finding, "There is no obligation on the part of Capital to indemnify Monarch for damages arising from Monarch's own negligence."

The indemnification agreement at issue, contained at paragraph 4.6.1 of the Monarch/Capital contract, reads in relevant part:

> To the fullest extent permitted by law, the Subcontractor [Capital] shall indemnify and hold harmless the Owner [Rite-Aid], Contractor [Monarch], Architect, Architect's consultants, and agents and employees of any of them from and against claims, damages, losses and expenses, including but not limited to attorney fees, arising out of or resulting

from performance of the Subcontractor's Work under this Subcontract, if such claim, damage, loss or expense is attributable to bodily injury, sickness, disease or death . . . , *but only to the extent caused in whole or in part by negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable,* regardless of whether or not such claim, damage, loss or expense is caused in part by a party indemnified hereunder. [Emphasis added.]

An indemnity contract is construed in the same fashion as are contracts generally. *Triple E Produce Corp v Mastronardi Produce, Ltd,* 209 Mich App 165, 172; 530 NW2d 772 (1995). "In construing any contract, whether one of indemnification or otherwise, the court will ascertain the intent of the parties both from the language used and from the surrounding circumstances." *Zurich Ins Co v CCR & Co (On Rehearing),* 226 Mich App 599, 607; 576 NW2d 392 (1997). Accordingly, "if a contractual term is otherwise ambiguous or subject to more than one possible construction within the four corners of the written instrument and the circumstances or relations of the parties underlying the contract resolve that ambiguity, the Court must inquire into them in performing its interpretive function." *Id.* In this case, the plain language of the indemnification agreement unambiguously states that Capital was required to indemnify Monarch "only" against claims arising from the "negligent acts or omissions of the Subcontractor, the Subcontractor's Sub-subcontractors, anyone directly or indirectly employed by them or anyone for whose acts they may be liable . . . ."

Capital argues that it is not clear for what Monarch is seeking indemnity, in light of the fact that Monarch

cannot be found liable under MCL 600.6304(4) for any damages that exceeded its own fault. *Kokx v Bylenga*, 241 Mich App 655, 663; 617 NW2d 368 (2000). Indeed, Monarch's argument on appeal is chiefly concerned with whether Capital must indemnify it against claims arising from Abray's negligence. As discussed above, both the retained control and common work area theories impose direct liability on the basis of negligence on the part of the contractor for failing to implement safety measures. Thus, although in Monarch's view, plaintiff himself caused his injuries, as a matter of law, Monarch must be found negligent for plaintiff to succeed under the theories alleged.

Therefore, the trial court correctly determined that the contractual language did not require Capital to indemnify Monarch against claims arising from its own negligence. Because plaintiff only seeks to hold Monarch liable for its own negligence, the trial court did not err in granting Capital's motion for summary disposition of Monarch's claim for indemnity against Capital.

Affirmed in part and reversed in part.